**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DALE E. NOTESTINE, | ) | CASE NO. 3:11-cv-01598 |
| | ) | |
| Petitioner, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| KEITH SMITH, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Dale E. Notestine ("Notestine"), challenges the constitutionality of his

conviction in the case of *State v. Notestine*, Ottawa County Court of Common Pleas Case No.

2007-CR-156.  Notestine, represented by counsel, filed his Petition for a Writ of Habeas Corpus

(ECF No. 1) pursuant to 28 U.S.C. § 2254 on August 2, 2011.  On November 15, 2011, Warden

Keith Smith ("Respondent") filed his Answer/Return of Writ.  (ECF No. 5.)  Notestine filed a

Traverse on December 12, 2011.  (ECF No. 6.)  For reasons set forth in detail below, it is

recommended that Notestine's petition be DENIED.

**I.  Summary of Facts**

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment

of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. §

2254(e)(1); *see also House v. Bell,* 283 F.3d 37 (6th Cir. 2002).  The state appellate court

summarized the facts underlying Notestine's conviction as follows:

[*P9]  The undisputed, relevant facts are as follows. On October 3, 2007, appellant was indicted by the Ottawa County Grand Jury on 15 counts of rape, in violation of R.C. 2907.02(A)(1)(c); 15 counts of unlawful sexual conduct with a minor, in violation of R.C. 2907.04(A); 15 counts of corrupting a minor with drugs, in violation of R.C. 2925.02(A)(4); two counts of providing obscene or harmful material to a juvenile, in violation of R.C. 2907.31(A)(1); four counts of drug possession, in violation of R.C. 2925.11(A); and one count of possession of drug paraphernalia, in violation of R.C. 2925.14(C)(1). The indictment was based on allegations made by E. L., a 13 year old female ("victim"), that appellant gave her drugs, forced her to perform sexual acts, and showed her pornographic materials over approximately a six-week period between June 1, and July 14, 2007.  The victim made the allegations after her juvenile probation officer ordered a drug screen which came back positive for cocaine and benzodiazepine.

[*P10]  A bench trial was held on April 21, 2008.  At the outset, the prosecution made a motion to exclude all use of evidence from the victim's juvenile record to impeach her credibility, pursuant to Evid.R. 609(D), which the trial court granted. The following witnesses were then presented by the prosecution: the victim; the victim's probation officer, Amanda Martin; Karen LaFountain, Program Director for Sandusky Treatment Alternate to Street Crime; B.C.I. investigator Anthony Perchau; and Danbury Township Police Detective Mark Meisler.

[*P11]  The victim testified at trial that she first became acquainted with appellant while visiting a mutual friend with her mother, T.S., when she was nine years old. In 2005, when the victim was 11 years old, she went to live with her father.  The victim did not see appellant again until May 2007, when her mother took her to visit appellant at his home on North Lake Pine Drive in Marblehead, Ohio.  The victim testified that T.S. had arranged to clean appellant's condo and prepare it for a memorial service to be held for appellant's deceased daughter in July 2007.

[*P12]  The victim stated that she and T.S. went to the condo "every other day" until July 14, 2007.  The victim testified that she was often left alone with appellant, a 63 year old man, while T.S. ran errands.  The victim further testified that, one time while T.S. was gone, she observed appellant smoking crack cocaine in his "computer room."  When appellant noticed the victim watching him, he offered her drugs.  After the victim smoked the crack cocaine, appellant began kissing and fondling her.  This behavior pattern was repeated every time T.S. left to run errands.  After several days, appellant progressed to digitally penetrating the victim and asking her to perform oral sex on him "countless times"; however, appellant was unsuccessful at attempting sexual intercourse.

[*P13]  The victim testified that, in the course of one particular day, she smoked crack cocaine at least 25 times with appellant. She further testified that, after about two weeks, she told T.S. about the drugs, but not about appellant's sexual

advances. The victim related that her mother did not want her to take the drugs; however, T.S. was unable to stop her from doing so, because T.S. also smoked crack with appellant. The victim further stated that, while she was under the influence of the drugs, she did not care what appellant did to her body.

[*P14]  The victim stated that appellant showed her pornographic pictures that were on his computer and, on at least one occasion, appellant asked her to sit with him and watch a pornographic movie.  She also stated that appellant had many books about sex in his computer room.

[*P15]  On cross-examination, the victim testified that she has lied in the past "to get out of trouble"; however, she did not characterize herself as "manipulative." The victim stated that she never smoked crack cocaine until appellant gave it to her.  She sarcastically referred to sexual activity with appellant as "all that happy stuff."  The victim testified that she and her mother spent at least ten nights at appellant's condo, and that both she and her mother did drugs with appellant.  The victim further testified that she was on probation for running away from home, and that she tested positive for drugs in July 2007, after submitting to a random drug test.

[*P16]  On redirect, the victim testified that she would sometimes stay up all night and do drugs in a room with appellant and her mother, and that sex happened "every other day" when she was with appellant.  The victim also testified that she sometimes lies about "small things," like smoking cigarettes, to get out of trouble with her father.  The victim stated that she never lied about the crack cocaine, the pornographic pictures, or having sex with appellant.

[*P17]  Amanda Martin testified at trial that she has been the victim's probation officer since July 2006.  Martin stated that she saw the victim on July 5, 2007, for a scheduled visit, at which the victim appeared tired, and had "baggy eyes." Martin referred the victim for drug testing that same day, which revealed the presence of cocaine and benzodiazepine in her system.  Martin further stated that, two weeks later, the victim again tested positive for cocaine, after which she was arrested and taken to juvenile detention for two days, followed by house arrest.

[*P18]  On cross-examination, Martin testified that, before June 2007, the victim showed up for most of her probation appointments, which were part of a diversion program.  Martin also stated that the victim is sometimes untruthful. On redirect, Martin clarified that the victim is truthful "for the most part"; however, she tends to manipulate others if she is in trouble.  Martin stated that, for the last six months, the victim has been truthful about the allegations against appellant and that, in her opinion, the victim has only ever been untruthful about "non-serious things."

-3-

[*P19]  LaFountain testified at trial that she performed a random drug test on samples provided by the victim on July 5, 2007, and again on July 16, 2007.  On cross-examination, LaFountain testified that the court tells her what drug tests to run.  She further testified that benzodiazepine, a sedative, stays in the system for up to two weeks, and cocaine is detectable for up to three days.

[*P20]  Perchau, a forensic scientist, testified that he tested evidence found in appellant's apartment.  Perchau stated that the tested evidence included a metal container, a plastic container, and a funnel, all of which tested positive for traces of cocaine; a plastic bag containing marijuana; and a bag of more than 140 pills, some of which were the controlled substance Oxycodone, a generic form of Percocet.

[*P21]  Miesler testified that he began investigating allegations against appellant in August 2007, and executed a search warrant for appellant's home on September 27, 2007.  As a result of the search, Meisler removed a computer, drug paraphernalia, vegetable matter, a drug scale, pills, computer disks, photographs, and books from the premises.  Meisler testified that one of the items, a brass chore-boy, was used as a filter in a pipe used to smoke drugs.

[*P22]  On cross-examination, Meisler testified that the victim told him she started smoking crack cocaine sometime after seeing her mother and appellant using drugs.  Meisler stated that appellant told him that appellant gave her benzodiazepine three to five times.  He further stated that the victim recalled watching a movie with appellant in which girls were auditioning for Playboy magazine; however, such a movie was not found in appellant's home.  He testified that the search warrant was based on the victim's statements to police.

[*P23]  Meisler testified that another man named Greg, a friend of appellant, tried to remove a box containing cocaine from appellant's home during the search.  Greg was later indicted for drug possession. Meisler further testified that appellant was cooperative during the search. Meisler stated that his impression was that the victim was telling the truth about appellant. On redirect, Meisler testified that the victim's testimony was corroborated by the results of the search, and that she described accurately the process of "cooking" the drugs before smoking them.  He stated that T.S., whom he interviewed on March 18, 2008, was "defensive."  On re-cross, Meisler state that T.S. could still be charged with a crime and that, at one point during the interview, T.S. stated that she wanted an attorney.

[*P24]  At the close of Meisler's testimony, the prosecution rested.  At that point, testimony was presented by T.S.; Jennifer Briede, M.D.; Joseph Burns; the victim's maternal grandmother and step-grandfather, M.K. and D.K.; appellant's step-daughter, Dawn Flores; appellant's sister, Marcella Nugent.  Rebuttal

-4-

testimony was then presented by Patti Hopple; and the victim's paternal
grandmother, J.R.

[*P25]  T.S. testified at trial that the victim has a history of behavioral problems,
beginning with expulsion from daycare at age four.  She further testified that the
victim's misbehavior included skipping school, smoking, and boys.  T.S. said that
she gave up custody of the victim when the girl was ten years old.  T.S. testified
that she did not have a sexual relationship with appellant, but that she helped him
clean his home four or five times in June 2007, while he was recovering from
knee surgery.  T.S. further testified that she sometimes left the victim with
appellant while she ran errands; however, they never acted "different" when she
came back.  T.S. said she never saw the victim with drugs; however, she did do
drugs with appellant in the past.  T.S. stated that nothing the victim says is
believable, and the victim has a reputation for untrustworthiness in the
community.

[*P26]  On cross-examination, T.S. testified that she has "done stuff" in the past
with drugs, including doing "one line" of cocaine and smoking pot with appellant.
She further testified that appellant asked her not to clean "his office" which the
victim had identified as the "computer room."  T.S. said she was surprised that
appellant had pipes to smoke crack cocaine, and she never saw the books
described by the victim; however, she knew he had pills.  T.S. stated that the
victim liked going to appellant's home, and she probably made up lies about
appellant when it became clear that T.S. did not want to regain custody of her
daughter.  On redirect, T.S. stated that the victim's father is a drinker and a drug
user.

[*P27]  Doctor Briede testified at trial that she is appellant's family physician.
Briede stated that appellant suffers from degenerative joint disease, heart disease,
and high blood pressure.  He receives prescription medication for those
conditions, including 120 Percocet [generic name Oxycodone] tabs per month; 90
valium [generic name benzodiazepine] tabs per month, in addition to prescription
muscle relaxers, blood pressure medication, heart medication, and blood thinners.
On cross-examination, Briede stated that appellant was instructed to keep all his
medications in the original containers.

[*P28]  Burns testified that he is a "family friend" who has known appellant and
T.S. for many years.  Burns further testified that T.S., who does not possess a
valid driver's license, borrowed his vehicle to go to appellant's home to clean.
On cross-examination, Burns testified that the victim and T.S. seem to get along;
however, the victim is "strong willed."  Burns stated that he never saw drugs or
"naked pictures" in appellant's home.

[*P29]  M.K., the victim's maternal grandmother, testified at trial that the victim

-5-

has a reputation for being "unbelievable" and likes to "fabricate to get out of trouble."  Both M.K. and her husband, D.K., testified that the victim stole cigarettes from D.K.'s business.  On cross-examination, M.K. testified that Burns drives T.S. around because she does not have a driver's license and is not supposed to drive a car.

[*P30]  Flores testified that appellant is liked by everyone.  Flores also testified that she saw the victim at the memorial service and again, later, when the victim told Flores she was upset with her father.  On cross-examination, Flores stated that both times she encountered the victim at appellant's home.  Flores stated that she was surprised that cocaine and crack pipes were found in appellant's home, because appellant is ill and can "hardly breathe."

[*P31]  Nugent testified that appellant visited her in Columbus, Ohio, from July 11, until July 17, 2007.  Nugent stated that, during his visit, appellant had difficulty breathing.  She was surprised that drugs were found in her older brother's home.

[*P32]  In rebuttal, Patti Hopple testified at trial that she is a volunteer mentor for teenage girls, and that she became the victim's mentor in November 2006.  Hopple stated that, since July 2007, the victim is more mature, and has been more focused on her emotions and goals.  Hopple further testified that the victim is now "bluntfully" truthful where, previously, she would exaggerate.  On cross-examination, Hopple stated that, while she does not know how the victim behaves at home or school, she is nevertheless surprised that T.S. says the victim is not truthful.

[*P33]  J.R., the victim's paternal grandmother and a volunteer mentor, testified that the victim lived in her home for a while after T.S. gave up custody.  J.R. testified that, during that time, the victim would often run away, after saying she wanted to live with her mother.  J.R. further stated that, in the beginning, the victim "lied about everything" and was a "streetkid."  However, now she believes the victim is telling the truth, and is not being manipulative.  J.R. stated that, through her volunteer work, she works with mentees to establish trust and get them to tell the truth.

[*P34]  At the close of all the testimony, the defense rested. After taking the matter under advisement, the trial court found appellant guilty of four counts of rape, seven counts of unlawful sexual conduct with a minor, 12 counts of corrupting another with drugs, one count of dissemination of matter harmful to juveniles, two counts of drug possession, and one count of possession of drug paraphernalia.  The remaining counts were dismissed.

[*P35]  On June 5, 2008, a sentencing hearing was held, at which appellant

refused to make a statement.  Thereafter, statements were made by the victim and J.R. The trial court then reviewed the evidence presented at trial, and stated that it also had reviewed the presentence investigation report, which included appellant's prior convictions for misdemeanor traffic offenses and receiving stolen property. The trial court noted appellant's poor physical health.  The trial court also noted that, while not evidence at trial, the record showed that the victim took three polygraph examinations, none of which indicated deception on her part.  Next, the trial court recited the factors and purposes of sentencing in felony cases, pursuant to R.C. 2929.11, which include appellant's relationship with the victim and her mother.  The trial court also stated that:

[*P36] "The victim is the offender' girlfriend's daughter. [The victim's] mother brought her to the place where these things happened.

[*P37] "It is not much of a stretch to suggest that the mother brought the daughter there so that these things could happen."

*State v. Notestine*, 2009 Ohio App. LEXIS 2752, 2009-Ohio-3220 at ¶¶8-37 (Ohio Ct. App., June 30, 2009).

## II.  Procedural History

### A.    Conviction

On October 3, 2007, an Ottawa County Grand Jury charged Notestine with fifteen counts of rape in violation of Ohio Revised Code ("O.R.C.") § 2907.02(A)(1)(C), fifteen counts of unlawful sexual conduct with a minor in violation of O.R.C. § 2907.04(A), fifteen counts of corrupting another with drugs in violation of O.R.C. § 2925.02(A)(4)(a), two counts of disseminating matter harmful to juveniles violation of O.R.C. § 2907.31(A)(1), four counts of drug possession in violation of O.R.C. § 2925.11(A), and one count of possessing drug paraphernalia in violation of O.R.C. § 2925.14(C)(1).  (ECF No. 5-2, Exh. 2.)

After a bench trial, Notestine was found guilty of four counts of rape, seven counts of unlawful sexual conduct with a minor, twelve counts of corrupting another with drugs, one count of disseminating matter harmful to juveniles, three counts of drug possession, and one count of

possessing drug paraphernalia.  (ECF No. 5-6, Exh. 6.)

Notestine was sentenced to an aggregate prison term of ninety-six (96) years.  (ECF No. 5-15, Exh. 15.)

**B.   Direct Appeal**

On June 26, 2008, Notestine, through counsel, filed a Notice of Appeal with the Court of Appeals for the Sixth Appellate District ("state appellate court") raising the following assignments of error:

> 1.   The trial court committed prejudicial error in prohibiting Appellant [f]rom eliciting any information regarding the victim's juvenile court [h]istory or record or specific instances of conduct.
>
> 2.   Appellant's indictment failed to include an essential element of the offense [a]nd is defective and voidable and fails to charge an offense.
>
> 3.   The verdict was against the manifest weight of the evidence.

(ECF No. 5, Exhs. 16 & 17.)

On June 30, 2009, Notestine's conviction was affirmed.[1]  (ECF No. 5-1, Exh. 1.)

Notesine did not file a timely appeal with the Ohio Supreme Court.  However, on January 4, 2010, Notestine, *pro se*, filed a motion for leave to file a delayed appeal, which the Ohio Supreme Court granted.  (ECF No. 23, Exhs. 23 & 26.)  In his memorandum in support of jurisdiction filed on March 26, 2010, Notestine raised the following propositions of law:

> I.   The State court judgments and convictions against Appellant are void because his convictions and sentences were secured in violation of liberties guaranteed by U.S. Const., Amend. VI and XIV when Appellant was denied the effective assistance of appellate counsel for counsel failing to raise the

---

[1]  Previously, on June 3, 2009, the state appellate court ordered the trial court to file a revised sentencing entry reflecting that the defendant had been found guilty by the court. (ECF No. 5-19, Exh. 19.)

additional issue on direct appeal that the Appellant's 'Nunc Pro Tunc' sentencing entry was errantly drafted so as to be void with no final appealable order having been issued in this case.

II.     The State court judgments and convictions against Appellant are void because his convictions and sentences were secured in violation of liberties guaranteed by U.S. Const., Amend. VI and XIV when Appellant was denied the effective assistance of appellate counsel for counsel failing to raise additional issues on appeal that the Trial Court denied Appellant his Constitutional right to due process by re-sentencing the Appellant by order of nunc pro tunc entry in absentia, in violation of Crim.R. 43[A]; Article One – Section 10 of the Ohio Constitution; 14th Amendment of the United States Constitution.

III.    The trial court committed prejudicial error in prohibiting Appellant from eliciting any information regarding the victim's juvenile court history or record of specific instances of conduct.

IV.     The State court judgments and convictions against Appellant are void because his convictions and sentences were secured in violation of liberties guaranteed by U.S. Const., Amend. VI and XIV when Appellant was denied the effective assistance of [a]ppellate counsel for counsel failing to raise the additional issues that Appellant's convictions were based upon insufficient evidence.

V.      The State court judgments and convictions against Appellant are void because his convictions and sentences were secured in violation of liberties guaranteed by U.S. Const., Amend. VI and XIV when Appellant was denied the effective assistance of appellate counsel for counsel failing to raise additional issue on direct appeal that the trial court committed error by not granting the Appellant's Rule 29 motion for judgment of acquittal.

VI.     The State court judgments and convictions against Appellant are void because his convictions and sentences were secured in violation of liberties guaranteed by U.S. Const., Amend. VI and XIV when Appellant was denied the effective assistance of appellate counsel as a result of the cumulative errors committed by appellate counsel during the direct appeal process.

(ECF No. 5-27, Exh. 27.)

On June 23, 2010, the appeal was dismissed as not involving any substantial constitutional question.  (ECF No. 5-28, Exh. 28.)

**C.      Application to Reopen Appeal**

On April 8, 2011, Notestine, through new counsel, filed a motion for delayed reopening of his appeal pursuant to Ohio Appellate Rule 26(B). (ECF No. 5-39, Exh. 39.)

On May 26, 2011, the state appellate court denied leave to reopen the appeal finding that Notestine failed to demonstrate good cause for the delay and that his claims were barred by *res judicata*. (ECF No. 5-41, Exh. 41.)

**D.      Other Filings**

On March 9, 2010, Notestine, *pro se*, filed a "Motion to Correct Status of Void Sentencing Entry," arguing that it was errantly drafted and void. (ECF No. 5-29, Exh. 29.) The trial court denied the motion on March 22, 2009. (ECF No. 5-30, Exh. 30.) Notestine's subsequent appeals to the state appellate court and Ohio Supreme Court were denied. (ECF No. 5, Exhs. 34 & 38.)

On August 8, 2011, Notestine, through counsel, filed a second "Motion of the Defense to Correct Status of Void Sentencing Entry." (ECF No. 5-42, Exh. 42.) At the time the instant habeas petition was filed, this motion had not been ruled upon.

**E.      Federal Habeas Petition**

On August 2, 2011, Notestine filed a Petition for Writ of Habeas Corpus and asserted the following grounds for relief:

> **GROUND ONE**: The trial court committed prejudicial error in prohibiting Appellant front eliciting any information regarding the victim's juvenile court history or record of specific instances of conduct, in violation of the Confrontation Clause.
>
> *Supporting Facts*: Notestine was indicted in 2007 in a multi-count indictment alleging several sex and drug offenses involving an allegation that he had provided a juvenile with drugs as a means of encouraging sexual favors from her.

-10-

The juvenile had made these allegations after being twice caught with positive drug tests while on probation.  The indictment, however, was a vague collection of representative counts, not tied to any specific act but rather tied generally to a generalized number of suspected bad acts.  This left the defense incapable of actually defending the case intelligently.  A bench trial eventually was conducted, with the sole important witness against Notestine being the child.  However, the trial court shut the defense down as to any useful cross-examination and confrontation of the child.  The prosecution, who had successfully blocked the defense from any meaningful attack on the credibility of the child, which was the sole issue at trial, then was allowed to bolster the credibility of that same child with the very types of evidence that the court had barred the defense from using.  When that occurred, defense counsel should have noted the injustice of this uneven treatment and should have noticed that this prosecution tactic opened the door for the defense to actually rebut the State case with the real story about this child.  However, defense counsel did almost nothing reasonable in this situation, instead largely just sitting back and watching as the prosecution and the trial judge violated any semblance of due process for Mr. Notestine.

**GROUND TWO**: Mr. Notestine was denied his federal right to effective assistance of trial and appellate counsel.[2]

*Supporting Facts*: (see above)  Also, appellate counsel failed Mr. Notestine for not raising this issue of effective assistance on direct appeal, as a result of which Mr. Notestine was denied effective assistance of appellate counsel.

(ECF No. 1.)

---

[2]   Nowhere in the petition or the traverse does Notestine argue that his appellate counsel was ineffective for any reason save for counsel's failure to challenge the sufficiency of his rape and unlawful sexual conduct with a minor convictions.  As such, the Court will not address whether his other convictions were also supported by substantial evidence.  Also, neither the petition nor the traverse makes any argument with respect to trial counsel's alleged ineffectiveness.  It is not this Court's function to find law or evidence in the record to support Notestine's undeveloped  "argument."  *See, e.g., McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (citations omitted).

### III.  Exhaustion and Procedural Default

**A.    Exhaustion Standard**

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered moot:  "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts."  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 347, 349 (6th Cir. 2001).

**B.    Procedural Default Standard**

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).  A claim may become procedurally defaulted in two ways. *Id.*  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate

grounds for precluding relief, the claim is procedurally defaulted.[3] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts. AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28. Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review. *Id.* In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal. *Id.* Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted. *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely

---

[3] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002).

as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A

petitioner can take four actions in his brief which are significant to the determination as to

whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon

federal cases employing constitutional analysis; (2) reliance upon state cases employing federal

constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms

sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts

well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir.

2003).

A petitioner's procedural default, however, may be excused upon a showing of "cause"

for the procedural default and "actual prejudice" from the alleged error.  *See Maupin*, 785 F.2d at

138-39.  "Demonstrating cause requires showing that an 'objective factor external to the defense

impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434

F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with

constitutional error." *Id*.  Where there is strong evidence of a petitioner's guilt and the evidence

supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied.  *See*

*United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th

Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994).  Prejudice does not occur unless

petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been

different.  *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (*citing Strickler v. Greene*,

527 U.S. 263, 289 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is

-14-

actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).  Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995)*; See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D.Ohio 2007).

## C.    Analysis

Respondent asserts that the state appellate court rejected as untimely Notestine's application to reopen pursuant to Ohio App. R. 26(B), and that the time-bar constitutes an independent and adequate state ground foreclosing federal habeas review.  (ECF No. 5 at 29-33.) While Respondent's factual statement is correct, it ignores the fact that Notestine specifically raised the argument that appellate counsel was ineffective for "failing to raise the additional issues that Appellant's convictions were based upon insufficient evidence" – the same issue he raises here.[4]  (ECF No. 5-27, Exh. 27.)  Respondent cites no law suggesting that a would-be petitioner must essentially exhaust his claim a second time before a state's highest court before it can be raised in a habeas petition.  Furthermore, Respondent also points out that the state appellate court found that *res judicata* further barred Notestine's Rule 26(B) application specifically because the issue was already raised before the Ohio Supreme Court.  As such, even

---

[4]  Notestine, in his traverse, appears to concede that his claims of ineffective assistance of appellate counsel are defaulted, save for those specifically raised before the Ohio Supreme Court.  (ECF No. 6 at 16-17.)

the state appellate court recognized that Notestine had exhausted his review.[5]  Essentially, the

state appellate court found that it could not review Notestine ineffective assistance of counsel

claim because that claim was already adjudicated by the state's highest court.

> As observed by our nation's highest court:

>> When a state court declines to review the merits of a petitioner's claim on the
>> ground that it has done so already, it creates no bar to federal habeas review.  In
>> *Ylst v. Nunnemaker*, 501 U.S. 797, 804, n. 3, 111 S. Ct. 2590, 115 L. Ed. 2d 706
>> (1991), we observed in passing that when a state court declines to revisit a claim
>> it has already adjudicated, the effect of the later decision upon the availability of
>> federal habeas is "nil" because "a later state decision based upon ineligibility for
>> further state review neither rests upon procedural default nor lifts a pre-existing
>> procedural default." n12  When a state court refuses to readjudicate a claim on the
>> ground that it has been previously determined, the court's decision does not
>> indicate that the claim has been procedurally defaulted.  To the contrary, it
>> provides strong evidence that the claim has already been given full consideration
>> by the state courts and thus is ripe for federal adjudication.

*Cone v. Bell*, 129 S. Ct. 1769, 1781 (2009); *accord Wogenstahl v. Mitchell*, 668 F.3d 307, 322

(6th Cir. 2012) (finding that claims declined for review as untimely under Ohio App. R. 26(B) are

not necessarily procedurally defaulted to the extent they were raised before the Ohio Supreme

Court upon direct appeal).

> Therefore, Notestine's second ground for relief is not defaulted and will be addressed on

the merits below.

---

[5]  In *State v. Davis*, 894 N.E.2d 1221, 119 Ohio St. 3d 422 (Ohio 2008), the Ohio
Supreme Court found that its failure to accept a discretionary appeal should not be
considered a statement on the merits of the legal issue appealed, and therefore, such
refusal does not bar subsequent consideration of a 26(B) application by a state appellate
court.  Notably, while not expressly addressing the matter, nowhere does the opinion
suggest that seeking discretionary review before the filing of an application to reopen is
procedurally improper.

## IV.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable
> > application of, clearly established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of
> > the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States

Supreme Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d

1006, 1010 (6th Cir. 2005).  However, an explicit statement by the Supreme Court is not

mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent"

also qualify as "clearly established law."  *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v.

Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)).

A state court's decision is contrary to clearly established federal law "if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts."  *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's

decision involves an unreasonable application of clearly established federal law "if the state

-17-

court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions."  *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

**A.    Ground One: Confrontation Clause**

In ground one of the petition, Notestine argues that the trial court's decision to bar defense counsel from introducing the victim's juvenile court history or questioning the victim regarding specific instances of conduct contained in her juvenile record resulted in a violation of the Confrontation Clause.  (ECF No. 1.)

The Sixth Amendment's Confrontation Clause guarantees the right of a criminal defendant in a state or federal prosecution "to be confronted with the witnesses against him." U.S. Const. Amend. VI; *see also Pointer v. Texas*, 380 U.S. 400, 407 (1965); *accord Davis v. Alaska*, 415 U.S. 308 (1974).  Cross-examination is a "primary interest" secured by the Confrontation Clause; indeed, it "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 315–16 (internal quotations omitted).  The Sixth Circuit has outlined the boundaries of cross-examination in light of the holding in *Davis* and its progeny:

-18-

In *Davis*, the state charged the defendant with stealing a safe.  To insulate the credibility of its star witness, the prosecution sought a protective order barring the defense from referring to the witness's juvenile record. *See id*. at 310-11.  The defense protested that because the witness feared his probation would be revoked, he was subject to undue police pressure and therefore possibly biased against the defendant.  *Id*. at 311.  The trial court granted the protective order, relying in part on an Alaska law giving it discretion to admit a juvenile record in these circumstances, *id*. at 311 & n.1, and the defendant was convicted.  In the passage relevant to Vasquez's case, the Supreme Court explained:

> Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness.  One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness.  By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony.  The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness.  A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.

*Id*. at 316.  The Court reversed the defendant's conviction because the state courts had prohibited him from probing the witness's possible bias.  *Id*. at 317-18.

In *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), the Supreme Court refined the meaning of *Davis*.  Although *Davis* had recognized the importance of cross-examining a witness regarding bias, *id*. at 678-79, *Van Arsdall* stressed that "[i]t does not follow . . . that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness."  *Id*. at 679.  For example, the judge may impose "reasonable limits" to avoid "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Id*.  The Confrontation Clause "'guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *Id*. (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (per curiam)).  Applying these principles, *Van Arsdall* acknowledged a Confrontation Clause violation because the trial court had "prohibited all inquiry into the possibility that [the witness] would be biased as a result of the State's dismissal of his pending public

-19-

drunkenness charge." *Id.*  The Court then restated its rationale: "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias . . . .:" *Id.* at 680 (citing *Davis*, 415 U.S. at 318).

These cases demonstrate that the Confrontation Clause affords the right to impeach a witness with his criminal record, subject to the trial court's discretion to impose reasonable limitations to prevent harassment and annoyance of the witness. *Van Arsdall*, 475 U.S. at 679.  Impeachment with prior crimes is precisely the "otherwise appropriate" cross-examination permitted under *Van Arsdall.* 475 U.S. at 680.  It is a prototypical form of cross-examination, even if it goes only to the witness's credibility. *See Davis*, 415 U.S. at 316.

*Vasquez v. Jones*, 496 F.3d 564, 570-571 (6th Cir. 2007).

After finding that the trial court's decision to bar evidence of the victim's juvenile record was proper under Ohio law, the state appellate court addressed Notestine's federal constitutional claim as follows:

[*P45]  As to appellant's remaining argument, the United States Supreme Court has held that that [sic] "the right to cross-examine an adverse witness for bias outweighed the state's policy interest in protecting the confidentiality of a juvenile offender." *Covington*, *supra*, citing *Davis v. Alaska* (1975), 415 U.S. 308, 319, 94 S. Ct. 1105, 39 L. Ed. 2d 347.  However, as set forth above, the record contains direct testimony that the victim is capable of lying and manipulating others to get herself out of trouble.  In fact, the victim herself testified that she sometimes lies to her father to avoid punishment for smoking cigarettes, and stated that she has taken cigarettes from her step-grandfather's business.  Accordingly, appellant was not deprived of an opportunity to show that the victim has been manipulative in the past, or that she may have had a motive to accuse appellant of wrongdoing in order to avoid punishment after testing positive for drugs.

*Notestine*, 2009-Ohio-3220 at ¶45.

Although the state appellate court's analysis of Notestine's Confrontation Clause argument is rather terse, the Court cannot find that it resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  While the more prudent course for the trial judge may have

-20-

been to allow the defense to impeach the victim with her juvenile records, the trial judge essentially allowed the substance of the records to be admitted into evidence, as there was testimony from the victim that she steals and that she has issues with her candor.

In *Van Arsdall*, the Supreme Court found that a judge may impose "reasonable limits" concerning defense counsel's inquiry into the potential bias of a prosecution witness.  The state court's decision was not unreasonable, as the limitations imposed by the trial judge arguably were necessary to eliminate repetitive testimony that was only marginally relevant.  Furthermore, this was a bench trial.  Given the volume of admitted evidence related to the victim's history of untruthfulness, it was not unreasonable for the trial judge to find that specific instances of lying contained in the juvenile records,[6] unrelated to the charges against Notestine, were not particularly relevant.  Moreover, it was not an unreasonable application of the law for the state appellate court to find that the trial judge's rulings did not hinder Notestine's ability to effectively cross-examine, and thereby confront, the witnesses against him.

### 1.  Harmless Error

Finally, even if this Court were to find that the state appellate court's decision was an unreasonable application of clearly established law and that the trial court impermissibly limited Notestine's constitutional right to cross-examine the witnesses against him, such a violation would be subject to harmless error analysis.  *See, e.g., Hargrave v. McKee*, 248 Fed. Appx. 718, 728 (6th Cir. 2007) ("Unconstitutional limitations on cross-examination are normally subject to harmless-error analysis."); *Dittrich v. Woods*, 419 Fed. Appx. 573, 578 (6th Cir. 2011) ("We

---

[6] It should be noted that some specific instances of lying were admitted despite their lack of any connection to the crimes charged (*i.e.* false statement that the victim's father sold her bicycle for drugs.)  (Tr. 141.)

review a habeas petitioner's claim of Confrontation Clause violations for harmless error.")  In *Van Arsdall*, the Supreme Court held that "[w]hether the error is harmless beyond a reasonable doubt depends on the following factors: 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *United States v. Gabrion*, 648 F.3d 307, 337-338 (6th Cir. 2011), vacated by 2011 U.S. App. LEXIS 23290 (6th Cir. Nov. 17, 2011).  In the present matter, the importance of the victim's testimony cannot be overstated, especially with respect to the sex offenses, as she was the only witness against Notestine.  However, the testimony that defense counsel wished to elicit – that Notestine had a juvenile record of several thefts and specific instances of lying – was largely cumulative.[7]  The victim, on cross-examination, testified that: (1) she lies, typically to get out of trouble (Tr. 110); (2) she lied that her father had sold her bicycle to buy drugs (Tr. 141); (3) she used to steal (Tr. 142); and, (4) she does not lie about big things.  (Tr. 159).  Although there were no other witnesses to corroborate the victim's testimony as to the sexual offenses, the victim's testimony related to the drug offenses were largely corroborated by the fruits of the search of Notestine's home.  Aside from the juvenile record, the extent of the cross-examination was rather permissive and other witnesses were allowed to testify concerning the veracity, or lack thereof, of the victim.

---

[7] Prior to trial, defense counsel indicated that she wanted to cross-examine the victim about a couple of thefts, lies made to probation, and a false claim made to others in juvenile detention that she had previously underwent a kidney transplant.  (ECF No. 5, Exh. 9, Tr. 6.)

In a recent decision, the Sixth Circuit explained that the appropriate inquiry "is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Babcock v. Metrish*, 2012 U.S. App. LEXIS 5035 at ** 7-8 (6th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

> [T]he United States Supreme Court has explained that the district court judge should ask him or herself "'Do I, the judge, think that the error substantially influenced the jury's decision?'" *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995).  "If the judge is certain that the error had no or a small effect, the verdict must stand.  However, if the matter is so evenly balanced that the judge has 'grave doubts' as to whether the trial error had substantial or injurious effect or influence in determining the jury's verdict, such that the matter is so evenly balanced that he feels himself in a 'virtual equipoise' as to harmlessness, the judge must treat the error as if it were harmful and grant the petitioner's writ."  *Jensen v. Romanowski*, 590 F.3d 373, 378 (6th Cir. 2009), quoting *O'Neal*, 513 U.S. at 435 & 445; *Stallings v. Bobby*, 464 F.3d 576, 582 (6th Cir. 2006).

*Id*. at ** 7-8.

Utilizing the *O'Neal* test, the Court finds that any violation of the Confrontation Clause herein had a minimal effect and, therefore, the verdict should stand.  The trial judge, who was also the fact finder in Notestine's trial, was aware of the juvenile records and heard argument about the proposed cross examination of the victim, but found that the information "has nothing to do with this case, nor does it bare [sic] directly on credibility."  (Tr. 142.)  Given the significant amount of testimony concerning the victim's propensity to lie when it suits her, and the fact that the trial judge did not find the specific information counsel wished to introduce particularly relevant, this Court is confident that if there was a violation of the Confrontation Clause it did not have a substantial and injurious effect or influence on the trial judge's verdict.

**B.     Ground Two: Ineffective Assistance of Appellate Counsel**

To establish ineffective assistance of counsel, a petitioner must demonstrate that his

counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985). A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair. *Id*. To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy. *Id*. at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

Claims of ineffective assistance of appellate counsel are also subject to the *Strickland* test. *See Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993). Counsel must provide reasonable professional judgment in presenting the appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986), *quoting Jones v. Barnes*, 463 U.S. 745,

751-52 (1983). However, failure to raise "significant and obvious" issues on appeal can constitute ineffective assistance of appellate counsel. *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999). Nonetheless, no decision of the Supreme Court "suggests ... that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U S 745, 750-54 (1983); *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990) (tactical choices are properly left to the sound professional judgment of counsel). Failure of appellate counsel "to raise an issue on appeal is ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005), *citing Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001).

In ground two, Notestine asserts that appellate counsel was ineffective for failing to raise a sufficiency of the evidence claim on direct appeal. (ECF Nos. 1 & 6.) Respondent contends that appellate counsel's decision to omit such an argument was a matter of strategy to winnow out the weaker arguments; and, Notestine cannot show that there is a reasonable probability his sufficiency appeal would have been successful. (ECF No. 5 at 34-35.)

If sufficient evidence supports Notestine's convictions for rape and unlawful sexual conduct with a minor, then appellate counsel cannot be deemed ineffective for failing to raise the issue on appeal. The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged. *In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The standard for determining if a conviction is supported by sufficient

evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses.  *See id.; Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983).  Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences arising from the record ... should be resolved in favor of the prosecution." *Heinish v. Tate*, 9 F.3d 1548, 1993 WL 460782 (6th Cir. 1993) (unpublished opinion), *citing Walker*, 703 F.3d at 969–70; *Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency review).

Under Ohio law, a conviction for rape does not require the presence of physical evidence. *See, e.g., State v. Johnson*, 858 N.E.2d 1144, 112 Ohio St. 3d 210, 217, 2006-Ohio-6404 (Ohio 2006) (rejecting a sufficiency of the evidence claim based on a lack of physical evidence of rape); *accord State v. Ward*, 2010-Ohio-6462 at ¶62, 2010 Ohio App. LEXIS 5363 (Ohio Ct. App., Dec. 28, 2010); *see also State v. Love*, 550 N.E.2d 951, 49 Ohio App. 3d 88, 91 (Ohio Ct. App. 1988) ("no requirement, statutory or otherwise, that a rape victim's testimony be corroborated as a condition precedent to conviction.")

Before the state appellate court, Notestine raised only a manifest weight of the evidence claim.  (ECF No. 5, Exh. 17.)  The state appellate court, while not specifically addressing whether Notestine's rape and unlawful sexual conduct convictions were supported by sufficient evidence, necessarily found so when it ruled that they were not against the manifest weight of

-26-

the evidence.  *See Nash v. Eberlin*, 258 Fed. Appx. 761, 765 (6th Cir. 2007) (a determination by a state appellate court that a conviction was supported by the manifest weight of the evidence necessarily implies a finding that said conviction was also supported by sufficient evidence); *accord Frashuer v. Clipper*, 2012 U.S. Dist. LEXIS 39765 (N.D. Ohio, Feb. 17, 2012); *Hughes v. Warden, Chillicothe Corr. Inst.*, 2011 U.S. Dist. LEXIS 54131 (S.D. Ohio Apr. 27, 2011).

Admittedly, the state appellate court's discussion of whether there was evidence of four acts of rape and seven acts of unlawful sexual conduct with a minor is rather perfunctory.  This Court has, therefore, conducted its own independent review of the trial transcript.  The trial testimony of the victim concerning the sexual offenses was as follows:

- She frequently went to Notestine's home with her mother beginning in late May until July 14, 2007.  Towards the end of that time period, she went to his home "every other day."  (Tr. 68.)  On cross-examination, she indicated that by the third week of June, she went to Notestine's two to three times a week.  (Tr. 115.)

- Every time she went to Notestine's home with her mother, her mother, at Notestine's request, would leave to run errands.  She would be gone anywhere from fifteen minutes to an hour and a half.  (Tr. 71-72.)

- Notestine introduced her to crack, and she started smoking crack with him.  (Tr. 73.)

- A few days after she started smoking crack, Notestine began touching and kissing her chest.  (Tr. 84.)

- A few days later, Notestine had "progressed" to digital penetration of her vagina.  (Tr. 85.)  These activities occurred in the office, bedroom, and living room.  *Id.*

- Every time Notestine touched her sexually, she was under the influence of drugs and she did not care what he did to her.  (Tr. 85.)

- Things progressed to where Notestine would perform oral sex on her, and made her perform oral sex on him.  He also attempted to engage in sexual intercourse with her, but he did not have an erection.  (Tr. 86.)

- This progression happened every time her mother left the house.  (Tr. 87.)

-27-

- Notestine touched her inappropriately every time her mother left the house, and she left the house every time they visited him.  (Tr. 86-87.)  By the end of June Notestine would touch her even when her mother was in the house.  *Id.*  The described activity always occurred after she had consumed drugs.  (Tr. 87.)

- She performed oral sex on Notestine "countless of times."  (Tr. 87.)

- When questioned about where the second incident of digital penetration occurred, she responded "[a] lot of the same things because it was basically the same things every day or the days that I was there."  (Tr. 126.)

- Though she could not specify how many times Notestine engaged in sexual activity with her other than saying it happened "countless times," she stated that "he wouldn't just do one thing to me one day.... He would probably do it five times in one day, at least, from what I am thinking.  (Tr. 129-30.)

- Towards the end of the time that she went to Notestine's house, when she was going every other day, Notestine would perform sex acts every time she was there.  (Tr. 153.)

(ECF No. 9, Exhs. 9 & 10.)

The victim's testimony, which alone is sufficient to uphold a conviction, identifies numerous instances of sexual conduct.  While no precise number is given, the evidence supports *at least* eleven separate instances of sexual conduct.  First, Notestine engaged in four different kinds of sexual conduct with the victim, which would support a conviction for rape or unlawful sexual conduct with a minor.  Notestine performed oral sex on the victim, received oral sex from the victim, digitally penetrated the victim's vagina, and attempted to engage in sexual intercourse with the victim.[8]  The testimony can fairly be interpreted to include multiple incidents of oral sex and digital penetration.  The victim testified that she was made to perform

---

[8]  Notestine's inability to sustain an erection is irrelevant, as "[p]enetration, however slight, is sufficient to complete vaginal or anal intercourse" pursuant to the statutory definition of "sexual conduct."  O.R.C. § 2907.01(A).

-28-

oral sex on Notestine countless times – not just once – and that this conduct occurred in three separate rooms, every other day (or at a minimum two to three times a week) over no less than a three week span.  The victim's testimony as a whole must be believed, and this Court must make all reasonable inferences in favor of the prosecution without weighing credibility.  Although the Court cannot determine why the trial court chose to find Notestine guilty of eleven counts, the evidence is sufficient to support doing so.

Based on the above testimony, this Court finds that there is no merit to Notestine's sufficiency claim and it is improbable that presenting the issue to the state appellate court would have changed the result of his appeal.

### V.  Conclusion

For the foregoing reasons, it is recommended that Notestine's Petition be DENIED.

/s/ Greg White
U.S. MAGISTRATE JUDGE

Date: June 8, 2012

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6ᵗʰ Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**